CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 31 2018

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CANDI L., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00030 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:  Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Candi L. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). ECF No. 13. Having considered the administrative record, the parties'

briefs, and the applicable law, I find that the Commissioner's decision is supported by substantial

evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Candi L. filed for DIB and SSI in February 2014, alleging disability status-post thyroidectomy and right-hip replacement. Administrative Record ("R.") 69, 77, ECF No. 10-1. She alleged disability as of March 22, 2013, at which time she was thirty-six years old. *Id.* Disability Determination Services ("DDS"), the state agency, rejected her applications in May 2014, R. 85–86, and in August of the same year, R. 105–06. On March 4, 2016, Candi L. appeared with counsel for an administrative hearing before ALJ Theodore Annos, where she testified about her medical conditions and alleged functional limitations, R. 40–60. A vocational expert ("VE") also testified at this hearing. R. 61–67.

ALJ Annos issued an unfavorable decision on March 25, 2016. R. 19–33. He found that Candi L. had two "severe impairments: bilateral hip disorder status-post right hip replacement and obesity." R. 21. Her other medical conditions were deemed non-severe impairments, and her severe impairments did not meet or medically equal any of the impairments listed in the Act's regulations. R. 21–23. ALJ Annos then evaluated Candi L.'s residual functional capacity ("RFC") and found that she could perform

> a range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she is limited to occasional pushing and pulling with the lower extremities; can never climb ladders, ropes, and scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and can occasionally be exposed to extreme cold, vibration, and hazards (such as unprotected heights and moving mechanical parts).

3

R. 23.[1] This RFC ruled out Candi L.'s return to her past relevant work as a medical technician.

R. 31. Finally, based on this RFC finding and the VE's testimony, ALJ Annos concluded that

Candi L. was not disabled after March 2013 because she still could perform certain sedentary

occupations that offered a significant number of jobs both nationwide and in Virginia. R. 32. The

Appeals Council denied her request for review, R. 1–3, and this appeal followed.

## III. Discussion

Candi L.'s arguments on appeal challenge ALJ Annos's RFC assessment. *See generally*

Pl.'s Br. 5–22, ECF No. 18. A claimant's RFC represents her "maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis" despite

her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted);

*see* 20 C.F.R. §§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on

all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226,

230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting

effects of impairments that are supported by the medical evidence or the claimant's credible

reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015).

The ALJ's RFC assessment must "include a narrative discussion describing" how medical facts

and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining

why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health,*

*Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). This discussion should "build an accurate

and logical bridge from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet these lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," but are not presumed disabled. SSR 96-9p, 1996 WL 374185, at *3.

176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37.

Candi L. argues that ALJ Annos's RFC assessment fell short of this standard because he erred in discounting Candi L.'s statements and two treating physicians' opinions describing even more significant pain-related physical limitations than ALJ Annos found to be supported by the record. *See* Pl.'s Br. 6–17, 19–22. She also objects that the RFC finding is fatally flawed because ALJ Annos did not expressly say whether Candi L. "needs a cane, and whether she needs a cane for *balancing* or support," *id.* at 21, did not conduct the required "function-by-function analysis" before announcing his "bare-bone[s] conclusion" that she could perform a range of sedentary work, and did not make any "definite findings" about her remaining abilities to sit, stand, walk, or lift and carry during a normal workday, *id.* at 18–19. These arguments are not persuasive.

A.     *Summary of Relevant Evidence*

Candi L. "has had progressive pain in her right hip since she was a child." R. 319. Starting in 2008, she "tried several different treatment modalities, mostly anti-inflammatories and intraacticular cortisone injection, [and] home exercise program[s], all with no significant relief of her right hip osteoarthritis" pain. *Id.* Diagnostic images taken in October 2012 showed "mild to moderate degenerative changes" of the bilateral hips, "slightly worse on the right than the left," and "some loss of cartilage . . . particularly on the right." R. 313. On March 27, 2013, Michael Diminick, M.D., performed a total right hip replacement in an effort to "definitively treat[]" the painful "osteoarthritis [in] her right hip," R. 376. Candi L. alleges that she cannot work because the pain "never got better" after this surgery, and she will eventually have to "replace the left hip" to relieve the pain in that lower extremity. R. 48–49; *see* Pl.'s Br. 1–5.

1.     *Post-Operative Treatment Records*

Candi L. "progressed remarkably well" immediately after her hip surgery and was discharged home from the hospital on March 28, 2013. R. 260–61. At her first follow-up appointment on April 11, Candi L. reported that she was "full weight bearing. . . . using a rolling walker as an assistive device" and was "doing great," taking Lortab as needed for "occasional" pain. R. 382–83. On physical examination, the range of motion in her right hip was "acceptable at th[at] point post operatively" and she had equal motor strength in the affected area. *Id.* Harry Eschenroeder, M.D., instructed Candi L. to continue taking aspirin and using the walker until her next appointment with Dr. Diminick in four weeks. R. 382. On May 9, Candi L. presented to Dr. Diminick's office with a cane and said that her pain was improving. R. 373. X-rays taken that day showed a "well positioned total hip replacement without lytic or blastic lesions." *Id.* Her physical examination was normal, including "no pain in the groin with rotation," no cyanosis or edema, intact sensation "in the L4 to S1 distributions bilaterally," full plantar/dorsiflexion strength, and no neurovascular deficits, except that she walked "with a slight limp and with a cane." *Id.* Dr. Diminick wanted Candi L. "to participate in a few sessions of physical therapy for gait training and strengthening" so that she could "walk without the cane before returning to work." *Id.* On June 11, Candi L. told Dr. Diminick that she had "been trying to wean off of the cane but ha[d] significant pain the next day if she trie[d] to walk without it." R. 370. She was also "having difficulty standing for longer periods of time." *Id.* Dr. Diminick observed that Candi L. used a cane and walked with a limp, which he attributed "to weakness of the musculature surrounding the hip." *Id.* Otherwise, her physical examination showed "no pain in the groin with hip rotation," no cyanosis or edema, intact sensation in the L4 to S1 distributions bilaterally, full plantar/dorsiflexion strength, and no neurovascular deficits. *Id.* Dr. Diminick

referred Candi L. to physical therapy and gave her a "note to return to work on August 1, 2013." *Id.*

Candi L. started physical therapy on June 17, 2013. R. 291–96. She said she could not work because constant pain in her right hip restricted her lifting and movement, particularly her ability to ambulate effectively without using a single-point cane. *See* R. 291. The therapist observed that Candi L. walked with an antalgic gait using a single-point cane and had "restricted" range of motion and 4-/5 motor strength in her right hip, but normal range of motion and 5/5 strength in the left hip and lower extremity. R. 293. She had "poor" balance when standing on the right leg alone and "good" balance when seated. *Id.* The therapist opined that Candi L.'s rehabilitation potential was "excellent" if she attended two sessions a week for eight weeks. R. 294. A few months later, Candi L. discharged herself from physical therapy after attending only four sessions.[2] R. 295 (Oct. 10, 2013); *see* R. 298–301 (four encounter notes dated June 17–28, 2013). She had achieved her short-term goals of increasing the range of motion and strength in her right lower extremity. Her balance was still "poor" on the right side, but her overall pain level had improved from 4/10 to 2/10. R. 294–95.

At a follow-up visit with Dr. Diminick on July 23, 2013, Candi L. said that her hip was "much improved" with physical therapy and she had been walking without the cane for three weeks. R. 367. "She no longer ha[d] pain in the joint since having the surgery, but still ha[d] some mild pain in the musculature on the lateral aspect of the hip." *Id.* On examination, Candi L. walked "with a very slight limp" and reported "no pain in the groin with rotation." *Id.* Dr.

---

[2] At the administrative hearing in March 2016, Candi L. explained that it "was the physical therap[ist's] idea" for Candi L. to prematurely discharge herself from treatment because "there wasn't anything that she could not do at home that she was doing there." R. 54. Candi L.'s fourth and final encounter note (June 28, 2013) shows that she complained of increased pain after her session two days prior and that her physical therapist intended to "continue with [the] current plan of care." R. 301.

Diminick renewed Candi L.'s prescription for Lortab and said that she could "return to full work duty." *Id.* At her next visit on January 23, 2014, Candi L. told Dr. Diminick that her symptoms were "slowly improving," but she "still ha[d] pain in the joint when standing or walking for an extended period of time" and "need[ed] a cane if standing for longer than a few hours." R. 364. She took Tylenol as needed for pain. *Id.* On examination, Dr. Diminick observed that Candi L. had "slight difficulty transitioning from a sit to stand position," walked with a "slight limp," and endorsed "pain in the groin" at fifteen degrees internal rotation and thirty degrees external rotation. R. 365. Bilateral straight-leg raising tests were negative. *Id.* X-rays taken the same date showed that the surgical hardware was "well positioned" and "seem[ed] to be functioning well." R. 364; *see also* R. 355 ("[T]he degree of offset appears to be satisfactory and normal. The position of the components is satisfactory."). Dr. Diminick "explained that the bone may still be growing into the prosthesis and her symptoms should subside with time." R. 364. He instructed that Candi L. "should continue the strengthening exercises she learned in physical therapy as well as using the stationary bike" for exercise and prescribed Celebrex for pain based on her report that the medication "seemed to help" in the past. R. 364–65.

Candi L. returned to Dr. Diminick's clinic on a fairly regular basis through October 2014, and one final time in January 2016. *See* R. 361–63 (February), 351–53, 354–57 (March), 358–60, 420–22 (April), 413–15, 417–19 (May), 409–11 (June), 405–08 (August), 402–04 (October), 398 (Jan. 2016). She consistently reported continued pain in her right hip and groin despite taking various prescription medications. R. 351–52, 354, 358, 361, 402, 405–06, 409, 417–18. Her pain was worse when fully bearing weight on the right side, R. 351, 358, 361, but typically "mild when sitting," R. 351. Dr. Diminick repeatedly documented physical examination findings within normal limits except that Candi L. walked with a limp and endorsed pain with rotation of

8

the right hip joint, R. 352, 359, 361, 403, 406, 413, and he usually continued or adjusted Candi

L.'s pain medications as appropriate, R. 352, 358, 362, 402. He also prescribed one round of

steroid injections to the right iliopsoas tendon "for diagnostic and therapeutic purposes" in April

2014, R. 358, 420, which Candi L. later said provided "very little relief," R. 417. In March 2014,

she told Dr. Eschenroeder that she "trie[d] not to rely on supportive devices," but she did use a

"cane for support during severe episodes." R. 354. On examination, Dr. Eschenroeder observed

that Candi L. walked with a limp and endorsed "pain with active/resisted flexion" of the right

hip, but otherwise had "very good" passive ranges of motion without pain to 105 degrees flexion,

35 degrees abduction, 45 degrees external rotation, and 40 degrees internal rotation; normal

strength and tone throughout; no evidence of sensory loss in the affected area; neutral alignment

of right hip; and equal true leg length. R. 355–56. Dr. Eschenroeder advised against "any

consideration [of] component revision" surgery. R. 355. In August 2014, Candi L. reported new

pain in her left hip and groin for the past month, which Dr. Diminick thought was likely

attributable to Candi L. "overcompensat[ing] for her right hip" versus significant joint deformity

or progressive degeneration. R. 405 (noting "mild underlying degenerative changes" in the left

hip). He prescribed a Medrol Dosepak and Celebrex and noted that the "next step would be to

provide an injection" in the left hip if these medications did not provide adequate relief. *Id.*

Candi L. later said that she "manag[ed] well with Celebrex for her symptoms," R. 402, and that

she "never had [an injection] done on the left" hip joint, R. 54.

Diagnostic images taken in March, May, and October 2014 were either "normal" or

showed no obvious abnormalities in the right hip joint or surrounding muscles and tendons, R.

351, 355, 361, 402, 412–13, and one set of radiographs "disprove[d]" Dr. Diminick's suspicion

that Candi L.'s persistent discomfort "may have been secondary to cup overhang" or an ill-fitting

joint prosthesis, R. 402 (Oct. 2014). Dr. Diminick noted that they would "continue to treat conservatively at th[at] point." R. 402. At their final visit in January 2016, Dr. Diminick said Candi L. could "consider a revision" of the right hip replacement to address her pain even though the hardware was still "in good position" and that she "may ultimately benefit from" a total hip replacement on the left given her increasing pain with weight bearing and the "moderate degenerative changes with asymmetric joint space narrowing" seen on recent radiographs. R. 398–99. Candi L. responded that "she ha[d] a hearing for her disability and ha[d] some other issues to work out before considering surgery," but that she would follow up as needed. R. 398. One month later, Candi L. told another physician that Dr. Diminick had "recommended waiting" to have another surgery until she could "no longer tolerate the pain." R. 424.

In the fall of 2014, Dr. Diminick turned over management of Candi L.'s narcotic pain medications to her longtime primary care provider, Teresa Moore, M.D. R. 402. Candi L.'s bilateral hip pain was "tolerable" with several daily doses of Celebrex and Norco at that time, and there is no indication in Dr. Diminick's contemporaneous treatment notes that she reported using a cane for support or when standing and walking. *See* R. 402 (Oct. 2014), 405 (Aug. 2014), 413, 417 (May 2014). Candi L. visited Dr. Moore's clinic five times between November 2014 and February 2016. *See* R. 439–41 (Nov. 2014), 436–38 (Jan. 2015), 433–34 (Feb. 2015), 430–32 (May 2015), 424–27 (Feb. 2016). Dr. Moore typically continued or adjusted Candi L.'s pain medications based on her reported degree of symptom control since the prior visit. *See* R. 426, 433–34, 437, 441. On November 13, 2014, Candi L. said that she could "deal with the pain" at its current level when taking hydrocodone, walked with a cane at home, and was "awaiting [a] new line of hips before further surgery." R. 439 (spelling corrected). Findings on that date's physical examinations were largely normal, including "normal muscle strength and tone in all

10

extremities," no edema in either lower extremity, normal flexion and extension of the right hip,

and no indication that Candi L. used an assistive device on examination, except that Candi L.

endorsed "increased groin pain" when bearing weight on the right leg. R. 441. After this visit,

Dr. Moore or her colleagues routinely documented similarly unremarkable physical

examinations except to note that Candi L. presented with an assistive device and walked with an

abnormal gait. R. 437 ("Posture - Sitting propped up (with legs elevated and frequent position

shifts). Gait - Limping, use of an assistive device and stiff." (Jan. 2015)); R. 431 ("Posture -

Normal posture. Gait - Limping, use of assistive device (cane) and stiff. Note: though not

normal, improved." (May 2015)); R. 426 ("Gait - Use of assistive device, slow and cautious and

stiff." (Feb. 2016)). Dr. Moore also documented bilateral groin/upper thigh pain and "limited"

range of motion in both hip joints at the visit in February 2016. R. 426. On the same date, Candi

L. told Dr. Moore that she easily "gets off balance when standing on one foot," R. 425, that the

pain in her left hip was "getting worse," and that she spent "most days" "sitting in a chair and

leaning back with her legs elevated" to decrease the "constant" pain in both hips, R. 424. Taking

hydrocodone and gabapentin as needed for pain "allow[ed] her to do some of her activities of

daily living," but she still had "difficulty" getting dressed, bathing, walking at home and in the

community, fixing meals, going shopping, and cleaning her home. R. 424–25.

    2.    *Medical Opinions*

    On May 14, 2014, Bert Spetzler, M.D., reviewed Candi L.'s records submitted to DDS

through that date. R. 70–76, 78–84. Dr. Spetzler opined that Candi L. could occasionally lift

and/or carry twenty pounds and frequently lift and/or carry ten pounds; sit and stand and/or walk

for about six hours each during a normal eight-hour workday; push and/or pull without

limitation, up to the weights and frequencies shown for lift and/or carry; balance and climb

11

ramps or stairs without limitation; frequently stoop, kneel, crouch, or crawl; and occasionally
climb ladders, ropes, and scaffolds. *See* R. 72–74, 81–82. He explained that these restrictions
accommodated Candi L.'s condition after her hip-replacement surgery, including that she "still
ha[d] right hip pain and walk[ed] with a limp." R. 74, 82. Robert Weisberg, M.D., R. 105–06,
concurred with Dr. Spetzler's opinions and rationale after reviewing the same medical records in
August 2014. *See* R. 90–93, 101–02.

Dr. Diminick completed a Musculoskeletal Questionnaire on November 30, 2014. R.
388–90. He opined that Candi L. could sit or stand continuously for fifteen minutes each, but he
did not know the total amount of time that she could sit and stand/walk during an eight-hour
workday. R. 389. Candi L. did not need to elevate her legs with "prolonged sitting" or to
"include periods of walking during an 8-hour workday." *Id.* She did need to use a cane or other
assistive device "while engaging in occasional standing/walking," however. *Id.* Dr. Diminick
noted that Candi L. experienced chronic "hip pain," but he did not indicate that her physical
examinations revealed objective abnormalities such as "significantly reduced" range of motion,
sensory loss, or muscle weakness. *See* R. 388.

Dr. Moore completed a similar questionnaire in conjunction with Candi L.'s clinic visit
on January 27, 2015. R. 391–93; *see* R. 438 ("She is unable to participate in gainful employment
because of uncontrolled pain. Until she can get another right hip replacement that fits her joint
better, we are unlikely to get the pain controlled well enough to allow her to consistently and
reliably work. See form."). She diagnosed Candi L. with bilateral hip osteoarthritis, status-post
right hip replacement with failure to alleviate pain, and acetabular dysplasia of the left hip that
would "eventually need replacement," and she noted that Candi L. exhibited "significantly
reduced" range of motion, sensory loss around the surgical site, and "rare" muscle spasms or

weakness. R. 391. Dr. Moore opined that Candi L. could stand continuously for five minutes and

stand/walk for less than two hours total in an eight-hour workday. R. 392. Her ability to sit

depended on her pain and positioning—she could sit for five minutes at one time if seated in a

"regular stance" and for twenty minutes at one time if her legs were elevated. *Id.* She could sit

for about six hours total during an eight-hour workday "with legs elevated [and] positioning." *Id.*

If sitting for "prolonged" periods, Candi L. needed to be positioned "in a recliner" with her legs

"elevated slightly greater than perpendicular to her trunk." *Id.* She also needed to include periods

of walking during an eight-hour workday, but she could not "do much standing." *Id.* Finally,

"while engaging in occasional standing/walking," Candi L. needed to use a walker two or three

times a week and a "cane [at] all other times." *Id.*

    *3.*    *Candi L.'s Subjective Statements*

       In April 2014, Candi L. completed a Pain Questionnaire and Adult Function Report

describing how the pain in her right hip and both lower extremities affected her functional

abilities and daily activities. R. 206–07, 216–23. Her right hip hurt "constantly, but [was] much

worse when standing and walking. . . . Sitting in most chairs [was] uncomfortable for any

duration unless the legs [were] raised and properly positioned and supported." R. 206. Her left

foot and ankle throbbed when standing and walking for more than five or ten minutes. *Id.* Candi

L. spent most days sitting in her recliner reading or watching television and walking around for

five minutes "every hour or so." *See* R. 216, 220. She shopped in stores for forty-five minutes

once a week and "every couple of months" she went out to eat at restaurants or attended concerts

at her daughter's school. R. 219–20. Candi L. could tend to her personal needs, but dressing,

bathing, and using the toilet were painful. R. 217. She could not sit, stand, walk, squat, or kneel

"without significant pain." R. 221. She could "lift[] 3 lbs. or so" as long as she was not standing,

and she could walk for about ten minutes before needing to stop and rest for ten minutes. *Id.* If she stood for more than twenty minutes, then she needed "a cane or assistance walking for the rest of the day." *Id.* (spelling corrected). The cane was prescribed after her March 2013 surgery, and she still used it "when needed" "on occasion." R. 221–22.

At the administrative hearing in March 2016, Candi L. testified that she could not work because the constant pain in her right hip "never got better" after her surgery. R. 48. She will have to "replace the left hip" as well now that it is her "dominant leg," R. 49, and is also a source of constant pain, R. 51, 55. She explained that she had used a four-point "quad cane," which she held in her non-dominant left hand to take pressure off of her right side, "pretty much every day since [she] left the hospital" in March 2013 except "for maybe a week or so" when she was "trying to regain the strength back in [her] leg." R. 51–52, 55; *see* R. 221. She could stand for ten or twenty minutes before needing to sit down for ten minutes, and sitting for twenty minutes was "really painful" unless she sat "reclined back slightly" with her legs elevated. R. 48, 51. She could walk for "maybe ten minutes before . . . really hurting" and had to get "pretty dosed up" on prescription pain medications "to even do a grocery shopping trip." R. 51; *see* R. 56.

B.    *The ALJ's Decision*

ALJ Annos considered Candi L.'s physical impairments and pain-related limitations throughout his written decision. R. 22–31. At step two, he found that her obesity and "bilateral hip disorder status-post right hip replacement" were severe medical impairments because they caused "more than minimal limitations in [her] ability to perform basic work activities," R. 21, which, according to the regulations, include physical functions like sitting, standing, and walking. 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1) (2015). At step three, he explained that

these impairments did not meet or medically equal the listing for disabling "major dysfunction of

a joint" because

> [a]lthough the medical evidence reveals that the claimant walks with a limp, she
> reported to her medical providers that she can walk six blocks without the use of a
> cane. She only uses a cane for support during severe episodes and is able to stand
> for a few hours before requiring the cane (Ex. 5F, p. 14). During a visit with an
> orthopaedic specialist after her hip surgery, the claimant reported that she had
> been walking without a cane for 3 weeks (Ex. 5F, pp. 17–19). Further, the record
> reflects that when the claimant does require an assistive device, she uses a single
> hand-held cane. Therefore, the record does not establish that the claimant has an
> inability to ambulate effectively or perform fine and gross movements effectively.

R. 22 (citing R. 354, 367–69). He then set out a reasonably complete and accurate summary of

all the evidence related to Candi L.'s bilateral hip pain and alleged functional limitations,

including treatment notes, diagnostic images, medical opinions, and Candi L.'s statements both

to her healthcare providers and at the administrative hearing. R. 23–31.

After considering this evidence, ALJ Annos found that Candi L. could perform "a range

of sedentary work" as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she could

only occasionally push/pull with the lower extremities, balance, stoop, kneel, crouch, crawl, and

climb ramps or stairs and occasionally be exposed to extreme cold, vibration, and workplace

hazards, but never climb ladders, ropes, or scaffolding. R. 23. In crafting this RFC, ALJ Annos

explained the various reasons why he found Candi L's statements describing debilitating pain, as

well as Dr. Diminick's and Dr. Moore's treating-source medical opinions identifying extreme

pain-related functional limitations, to be inconsistent with or unsupported by specific portions of

the longitudinal record, and why the record as a whole supported imposing more restrictive

exertional and postural limitations than those identified by the two DDS reviewing physicians.

*See* R. 28–31.

C.    *Analysis*

Candi L. argues that ALJ Annos improperly discounted her complaints of pain and Dr.

Diminick's and Dr. Moore's opinions, particularly insofar as this evidence suggested that Candi

L. could sit for at most twenty minutes without changing positions and needed to use a cane or

walker in certain circumstances. *See generally* Pl.'s Br. 6–17, 19–22. She also objects that the

RFC assessment is fatally flawed because ALJ Annos did not expressly say whether Candi L.

"needs a cane, and whether she needs a cane for *balancing* or support," *id.* at 21, did not conduct

the required "function-by-function analysis" before announcing his "bare-bone[s] conclusion"

that she could perform a range of sedentary work, and did not make any "definite findings" about

her remaining capacities to sit, stand, walk, or lift and carry during a normal eight-hour workday,

*id.* at 18–19 (citing SSR 96-8p, 1996 WL 374184).

    *1.    Function-by-Function RFC Assessment*

Social Security Ruling ("SSR") 96-8p "instructs that the [RFC] 'assessment first must

identify the individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions' listed in the regulations,"

before the RFC finding can "be expressed in terms of the exertional levels of work, sedentary,

light, medium, heavy, and very heavy."[3] *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p, 1996 WL

374184, at *1); *see* 20 C.F.R. §§ 404.1545(b)–(d); 416.945(b)–(d). ALJ Annos's RFC

assessment plainly includes a function-by-function analysis of Candi L.'s maximum remaining

capacities to "occasionally"[4] push/pull with either lower extremity; "occasionally" engage in

---

[3] Requiring the ALJ to conduct this "initial function-by-function assessment" of the claimant's ability to perform "specific work-related functions" before expressing the RFC in terms of the exertional levels of work largely guards against the risk that the ALJ will "either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." SSR 96-8p, 1996 WL 374184, at *3, *4.

[4] "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185, at *3.

postural activities like climbing ramps/stairs, balancing, stooping, kneeling, crouching, and

crawling; and "never" climbing ropes/ladders/scaffolds. R. 23. Additionally, by restricting Candi

L. to "sedentary work as defined in" the governing regulations, *id.*, it is sufficiently clear that

ALJ Annos found Candi L. could "lift[] no more than 10 pounds at a time," occasionally lift or

carry lightweight objects like file folders, occasionally stand and walk, and do work that

otherwise involves sitting. 20 C.F.R. §§ 404.1567(a), 416.967(a). A normal eight-hour day doing

sedentary work would generally involve "about 6 hours" total sitting and "no more than 2 hours"

standing and walking. SSR 96-9p, 1996 WL 374185, at *3. Finally, ALJ Annos explained that he

gave "only partial weight" to the DDS physicians' opinions that Candi L. could do "light work"[5]

that involved "unlimited" balancing and climbing ramps/stairs and "frequent" or "occasional"

postural activities using the lower extremities (e.g., kneeling, crawling, crouching, climbing)

because "the record support[ed] limiting [Candi L.] to a reduced range of sedentary work with . .

. more restrictive postural limitations." R. 31.

    ALJ Annos's narrative discussion of Candi L.'s RFC also made clear "which evidence

[he] found credible and why," *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013), and

adequately explained why he discounted or rejected any "obviously probative" evidence, *Arnold*,

567 F.2d at 259, indicating that Candi L.'s bilateral hip disorder caused additional or more

restrictive functional limitations than those indentified in his written decision. For example, it is

sufficiently clear that the RFC finding did not reflect Candi L.'s alleged inability to "sit for more

---

[5] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b); *see* R. 73, 81, 92, 101. A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs . . . require a person to be standing or walking most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires a total of six hours standing/walking during a normal eight-hour workday. SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 73, 81–82, 92, 101.

than 20 minutes at a time without needing to change position," Pl.'s Br. 21, because ALJ Annos

rejected Candi L.'s and her physicians' suggestions that chronic hip pain actually limited her

capacity for sitting to that extreme extent, R. 24, 30 (citing R. 48, 389, 392). *Cf. Neice v. Colvin*,

No. 7:14cv24, 2015 WL 1169216, at *3 (W.D. Va. Mar. 13, 2015) ("Without a finding of a

functional limitation, the ALJ was not required to add such a limitation to the RFC.").

Candi L.'s overarching objection to "the ALJ's treatment of [her] need for a cane" Pl.'s

Br. 22, as part of the RFC assessment merits a bit more discussion. Candi L. asserts that ALJ

Annos "did not make an express, specific finding as to whether [she] needs a cane," and she

argues that this omission was reversible error because the VE testified that "if the claimant

needed a cane for balancing, then even sedentary work would be precluded," *id.* at 19–20

(emphasis omitted). *See* R. 64–66 (VE's testimony that a person who used a cane "just . . . for

mobility" could do a range of sedentary work, but if the cane were "used for balancing, then that

would preclude sedentary work as well"). Social Security Ruling 96-9p requires an ALJ to

consider "the impact of 'medically required' hand-held devices," such as a cane or walker, when

evaluating the claimant's RFC. *Wimbush v. Astrue*, No. 4:10cv36, 2011 WL 1743153, at *2–3

(W.D. Va. May 6, 2011) (quoting SSR 96-9p, 1996 WL 374185, at *7). "To find that a hand-

held assistive device is medically required, there must be medical documentation establishing the

need for a hand-held assistive device to aid in walking or standing and describing the

circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7. The claimant bears

the burden to show that her use of a particular hand-held assistive device to perform work-related

functions is in fact medically necessary and therefore should have been included in the RFC

finding. *See Morgan v. Comm'r, Soc. Sec.*, Civ. No. JKB-13-2088, 2014 WL 1764922, at *1 (D.

Md. Apr. 30, 2014) (citing *Timmons v. Colvin*, No. 3:12cv609, 2013 WL 4775131, at *8

(W.D.N.C. Sept. 5, 2013))).

Candi L. correctly points out that Drs. Diminick and Moore both "said she needs to use a

cane for occasional standing and walking," and Dr. Moore even said that she "needs a walker

two to three times a week, and a cane at other times." Pl.'s Br. 19. ALJ Annos, however,

explained that he gave "little weight" overall to these medical opinions because they were "not

consistent with or supported by" the physicians' own treatment notes and both doctors "failed to

provide any explanation or cites to objective findings" to support their opinions. R. 30. ALJ

Annos also found that Candi L. could occasionally balance without using any assistive device,

*see* R. 23, and that she only required a single hand-held "cane for support during severe

episodes" of pain, after standing "for a few hours" at a time, or when walking over extended

distances, R. 22. He further found that Candi L. walked with a limp, but "the record [did] not

establish . . . an inability to ambulate effectively." R. 22. ALJ Annos also rejected Candi L.'s

testimony that she had used a four-point "quad cane" almost continuously since March 2013

because that testimony contradicted her longitudinal treatment record and specific comments to

various healthcare providers. *See* R. 22, 28. Candi L. does not point to any specific piece of

medical evidence not considered by the ALJ showing that she "needed a cane for balancing,"

Pl.'s Br. 20, and she does not explain why the relatively unremarkable objective findings

documented throughout Dr. Diminick's and Dr. Moore's examination notes should have alerted

ALJ Annos to that possibility, *see id.* at 20–21. The fact that the VE testified that a hypothetical

person who needed a cane for balancing could not do sedentary work, R. 65–66, does not make it

any more likely that Candi L. was medically required to use an assistive device for that particular

purpose during the relevant time, *see* SSR 96-9p, 1996 WL 374185, at *7. *Cf. Reid v. Comm'r of*

*Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (finding no reversible error where the ALJ's factual

findings related to the relevant time were "amply supported by the record" and the claimant

"failed to point to *any* specific piece of evidence not considered by the Commissioner that might

have changed the outcome of his disability claim"). Accordingly, Candi L. has not shown that

reversal and remand is warranted for the ALJ to determine whether she medically "need[ed] a

cane for balancing or support," Pl.'s Br. 21. *See Morgan*, 2014 WL 1764922, at *1–2.

ALJ Annos's findings about Candi L.'s maximum remaining capacities to sit, stand/walk,

and balance during an eight-hour workday without needing to use a cane or other hand-held

assistive device, *see* R. 22–23, are supported by substantial evidence in the record and consistent

with the ability to perform a range of sedentary work as described in the VE's testimony and

relied upon by the ALJ in concluding that Candi L. was not disabled, *see* R. 31–32, 64–65. And,

as explained below, ALJ Annos also adequately explained why he discounted Candi L.'s and her

treating physicians' statements describing more extreme pain-related restrictions on her ability to

sit, stand, and ambulate effectively throughout an ordinary workday. Thus, this is not a case

where the ALJ overlooked material conflicting evidence about the claimant's work-related

abilities or limitations, *see Mascio*, 780 F.3d at 637, or otherwise "failed to 'build an accurate

and logical bridge from the evidence to his conclusion'" regarding the claimant's RFC, *Monroe*,

826 F.3d at 189 (quoting *Clifford*, 227 F.3d at 872). Moreover, the VE's testimony makes clear

that the specific sedentary occupations he identified in response to the ALJ's question

propounding the same RFC as ALJ Annos ultimately found, R. 62–63, would still be available to

a hypothetical person who needed to use a single-point hand-held cane "for mobility," R. 64–65.

    2.    *Candi L.'s Credibility*

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). The ALJ's articulated reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

At the beginning of his RFC analysis, ALJ Annos summarized Candi L.'s statements describing her "constant" hip pain and alleged physical limitations, R. 23–24, as well as the relevant treatment notes and other medical evidence, R. 24–27. He then found that Candi L.'s obesity and bilateral hip disorder "could reasonably be expected to cause [her] alleged

symptoms," but her statements describing "the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible."[6] R. 28. As support for this finding, ALJ Annos cited specific evidence showing that: (1) Candi L. "made inconsistent statements" about how often and under what circumstances she used a cane; (2) Candi L.'s hearing testimony describing her extremely limited ability to sit, stand, and walk was "contradicted by other evidence of record," including her prior comments to healthcare providers; (3) her treatment record revealed few significant abnormalities on neurophysical examinations and post-operative diagnostic images consistently showed the surgical hardware to be in good position; (4) "appropriate medications and other treatment" had been "relatively successful in controlling" her pain; (5) Candi L. had "not been entirely compliant in following prescribed treatment" because she prematurely discharged herself from physical therapy, which suggested that she was not "truly suffering to the extent alleged"; and (6) her daily activities "were not as limit[ed] as would be expected given [her] complaints of disabling symptoms and functional limitations." R. 28–29 (citations omitted).

These were legitimate reasons for ALJ Annos to question whether Candi L.'s chronic hip pain was really as severe or functionally limiting as she alleged, 20 C.F.R. §§ 404.1529(c),

---

[6] Candi L. asserts that a favorable "Step One finding means that the objective evidence made it *reasonably likely* that [Candi L.'s] impairments would produce pain *in the amount and degree alleged.*" Pl.'s Br. 22 (citing *Craig*, 76 F.3d 585); *see also id.* at 2, 5, 16. This is not correct. *Craig*, 76 F.3d at 591–92, 594–95; 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). The first step focuses on whether the claimant produced "objective medical evidence showing *the existence of a medical impairment* which *could reasonably be expected to produce* the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591 (emphasis added). "This threshold test does not, as the regulations are careful to emphasize, entail a determination of the 'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain," and the "pain claimed is not directly at issue" at this step. *Id.* at 594 (quoting 20 C.F.R. §§ 404.1529(b), 416.929(b)). The ALJ's favorable step-one finding merely means that Candi L. produced objective medical evidence of "a determinable underlying impairment . . . which could reasonably be expected to be the cause of the disabling pain" she described. *Id.* It does *not* mean that the ALJ definitively found the that objective medical evidence showed a "reasonable likelihood," Pl.'s Br. 2, that Candi L. *actually* suffers from disabling physical pain caused by her underlying medical impairments. *See Craig*, 76 F.3d at 591–92, 594–95.

416.929(c), and all but one were adequately supported by the record.[7] For example, Candi L.

often told Drs. Diminick and Moore that her hip pain was tolerable or adequately controlled with

daily narcotic medication and not bearing full weight on her right leg. *See, e.g.*, R. 367, 402,

430–31, 433, 436, 439. "If a symptom can be reasonably controlled by medication or treatment,

it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam). ALJ

Annos also recognized that orthopedic surgery, steroid injections, and daily prescription-strength

medications (e.g., Celebrex, Flexeril, Keflex, Lortab, Medrol, Norco) had only been "relatively

successful in controlling" Candi L.'s chronic pain, R. 28; *see* R. 24, and that she often told her

doctors about pain in her hips and groin that made it difficult for her to stand and walk for

extended periods, R. 24–27. Even so, Candi L. did "not have to be pain-free in order to be found

'not disabled,'" particularly where, as here, the ALJ found that she could work only "at a lower

exertional level," *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11,

---

[7] The only arguable exception is ALJ Annos's finding that Candi L.'s daily activities undermined her credibility. R. 29. "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). Here, ALJ Annos listed the daily activities that Candi L. could perform—such as eating out in restaurants, going grocery shopping, attending her daughter's school events, and doing physical therapy exercises at home—but he did not explain why he apparently rejected Candi L.'s qualifying statements that she went out to eat and attended "really special" school programs only every few months, R. 219, that she had to get "pretty dosed up" on pain medications just to go grocery shopping for thirty minutes once a week, R. 51, and that her home exercises consisted of twenty leg lifts and ten minutes on a recumbent stationary bicycle three times a week, R. 52. *See* R. 23–24, 29. ALJ Annos also cited several treatment notes dated between April 2013 and May 2014 that he apparently believed reflected Candi L.'s contemporaneous reports to Dr. Diminick and his colleagues that "she exercised 2–3 times a week, and her exercise included swimming." R. 29 (citing R. 353, 357, 360, 363, 366, 369, 372, 384, 422). This finding conflicts with Candi L.'s comment in her April 2014 Adult Function Report that she had not gone "swim[ming] in over a year due to pain." R. 220. Additionally, given that Candi L. underwent a total right-hip replacement in late March 2013, it seems likely that she provided this "lifestyle" information at an appointment before her surgery and that it was simply copied over to each subsequent treatment note. *Compare* R. 381 (Dec. 6, 2012), *with* R. 382–83 (Apr. 11, 2013). Without some explanation of how ALJ Annos reconciled these conflicts and ambiguities, I cannot find that this reason independently supports his adverse credibility determination. The omission is harmless, however, because his other reasons were legally adequate and supported by specific relevant evidence in the record. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

2011) (citing *Hays*, 907 F.2d at 1457–58), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011), than she did before her surgery, *see* R. 29, 31–32.

Candi L. also made inconsistent statements about how long she could sit and stand or walk and under what circumstances she used a cane. She testified at the administrative hearing in March 2016 that she could sit and stand or walk for at most twenty minutes at one time and that she had used a four-point quad cane almost continuously since her surgery three years earlier. R. 48, 51–52, 55, 56. As the ALJ correctly pointed out, however, Candi L. told her doctors that her symptoms were mild when sitting, she could walk several blocks without a cane, she used a cane for support only during severe episodes of pain, and she could stand for at least a few hours before needing a cane. R. 25–26, 28 (citing R. 351, 364, 367). On June 17, 2013, the physical therapist observed that Candi L. walked with a single-point cane, R. 293; six weeks later, Candi L. told Dr. Diminick that she had been walking without a cane for three weeks and had only "some mild pain in the musculature on the lateral aspect of the hip." R. 367. These inconsistencies bear directly on Candi L.'s allegations that her hip pain was so continuous or severe that it prevented her from performing jobs that primarily involved sitting. *See* R. 23–24, 30–31; Pl.'s Br. 19–20. On this record, it was not unreasonable for ALJ Annos to afford Candi L.'s comments to her doctors more weight than her testimony at the administrative hearing, R. 22, 28. *See Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (finding no error in the ALJ's adverse credibility determination where the claimant's medical record showed that she repeatedly either failed to report or expressly denied the symptoms and functional limitations that she described in her hearing testimony); *cf. Smith v. Astrue*, No. 5:12cv98, 2013 WL 3783958, at *4 (N.D. W. Va. July 18, 2013) (finding no error in the ALJ's adverse credibility determination where his written decision "sufficiently showed" there were

24

meaningful differences between the daily activities that the claimant described in her hearing testimony and those she described to one doctor).

Finally, ALJ Annos reasonably found that the objective medical evidence did not support Candi L.'s allegation that her bilateral hip disorder caused debilitating pain-related functional limitations. R. 28. Candi L.'s physical examinations were largely within normal limits except that she consistently walked with a limp and expressed some degree of pain with movement of her right hip joint, and eventually, also the left hip joint. *See e.g.*, R. 352, 355–56, 359, 361, 365, 367, 403, 406, 413, 426, 431, 437, 441. Additionally, although an October 2012 MRI showed "mild to moderate degenerative changes" of the bilateral hips that were only "slightly worse on the right than the left," R. 313; *see* Pl.'s Br. 7, 22, ALJ Annos correctly found that Candi L.'s left-hip pain did not manifest on physical examination until August 26, 2014, when she endorsed "mild" pain with internal and external rotation of that joint, R. 26 (citing R. 405). *See Felton-Miller*, 459 F. App'x at 229–30 ("[M]edical conditions alone do not entitle a claimant to disability benefits; [t]here must be a showing of related functional loss.'" (quoting *Gross*, 785 F.2d at 1166)). Dr. Diminick thought this new pain was likely attributable to Candi L. having "overcompensated for her right hip" given that she had only "mild underlying degenerative changes of her left hip" at that time. R. 405. ALJ Annos also correctly found that repeated diagnostic images showed the right-hip prosthesis was in good position throughout the relevant period. R. 28. The ALJ was permitted to rely on this objective evidence as one factor cutting against Candi L.'s allegations that her bilateral hip disorder caused "disabling symptoms and functional limitations" during the same time, R. 28–29. *See Hines*, 453 F.3d at 565 n.3 ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be

accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." (quoting *Craig*, 76 F.3d at 595)).

Candi L. does not challenge any of the ALJ's stated reasons for questioning the severity of her pain and alleged functional limitations. *See* Pl.'s Br. 22. Instead, she objects that ALJ Annos failed to conduct a balanced "whole-record review" because, although his "summary of the evidence [was] fairly thorough and evenhanded," he purportedly "did not consider evidence or argument pointing to the credibility of the treating physicians, or of [Candi L.] herself." *Id.* She asserts that this error is "shown by the ALJ's treatment of [her] need for a cane"; his "failure to consider the sheer frequency with which [she] complained of severe pain[] and the lengths to which she would go to get relief"; his "failure to mention significant evidence revealed by the MRI of October 2012," which revealed mild-to-moderate degenerative changes and some loss of cartilage in both hips; and his "failure to consider that at a certain point[ Candi L.] needed help to dress and to shower[] and that she was no longer doing any other cooking, cleaning, or childcare." *Id.* But Candi L. does not explain how any of this evidence—most of which ALJ Annos specifically discussed throughout his written decision—undermines his conclusion that, notwithstanding Candi L.'s frequent complaints and reliance on daily prescription medications, her chronic hip pain was not so severe that she could not work at all. *See* R. 28–31.

ALJ Annos "cited specific contradictory testimony and evidence in analyzing [Candi L.'s] credibility and averred that the entire record had been reviewed." *Bishop*, 583 F. App'x at 68 (finding no error where the ALJ did the same). His summary of the relevant evidence was indeed "fairly thorough and evenhanded," Pl.'s Br. 22, and there is no indication that he impermissibly ignored probative evidence tending to support Candi L.'s statements or "cherry-

picked" evidence to support his findings and conclusions. *Godfrey v. Berryhill*, No. 7:16cv580,
2018 WL 1474087, at *3 (W.D. Va. Mar. 26, 2018) ("The ALJ's exhaustive account of the
treatment records belie Godfrey's claim that he 'cherry-picked' evidence."). ALJ Annos reached
a different conclusion than Candi L. about her chronic hip pain, but he nonetheless
acknowledged that her complaints appeared throughout the medical record, R. 24–28, and, in his
RFC finding, accounted for them to a significant degree by restricting Candi L. to sedentary
work with additional limitations on postural activities involving the lower extremities, R. 23. *See*
SSR 96-9p, 1996 WL 374185, at *3. His overall conclusion that Candi L.'s statements describing
even more severe pain-related functional limitations were "not entirely credible" when compared
to other relevant evidence in the record, R. 28, was supported by substantial evidence and should
be affirmed. *Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc.*, 132 F.3d at 1011).

       *3.    Treating Physicians' Medical Opinions*

     Medical opinions are statements from "acceptable medical sources," such as physicians,
that reflect the source's judgments about the nature and severity of the claimant's impairment,
including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities.
20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). A treating physician's medical opinion is "entitled
to controlling weight if it is well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other substantial evidence in the record."
*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2),
416.927(c)(2). If the ALJ determines that the opinion is not entitled to controlling weight, then
the ALJ must adequately explain the weight afforded the opinion, taking into account all relevant
factors, including the nature and extent of the physician's treatment relationship with the
claimant; how well the physician explained or supported the opinion; the opinion's consistency

with the record as a whole; and whether the treating physician's opinion pertains to his or her

area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Radford*, 734 F.3d at 295–96.

Although treating physicians' medical opinions deserve deference, the ALJ may discount or

reject such an opinion when there is "persuasive contrary evidence" in the record.[8] *Mastro*, 270

F.3d at 178; *see Bishop*, 583 F. App'x 67; *Hines*, 453 F.3d at 563 n.2.

Before weighing the available opinions, ALJ Annos set out a reasonably accurate and

thorough summary of the relevant medical evidence, including Dr. Diminick's and Dr. Moore's

longitudinal treatment notes. R. 24–31. Dr. Diminick's notes showed that Candi L. initially

reported that her pain responded very well to surgery, but that beginning around January 2014,

she consistently reported pain in the right hip and groin that was worse with weight-bearing. R.

24–27. Dr. Diminick prescribed pain medications, one round of steroidal injections, and physical

therapy and encouraged Candi L. to use a stationary bike and work on strengthening exercises.

*See id.* His findings on physical examinations were generally "normal" except that Candi L.

consistently walked with a limp and endorsed pain with rotation of the right hip, and eventually,

also the left hip. R. 24–27. Dr. Moore's treatment notes reflected similar reports of bilateral hip

pain, generally unremarkable findings on physical examinations, and various prescriptions for

medications based on Candi L.'s reported level of symptom control. R. 27. Finally, multiple

---

[8] Candi L. appears to argue that a treating physician's medical opinion is presumptively entitled to controlling weight unless the Commissioner shows that the opinion *is* inconsistent with other substantial evidence in the record or *is not* well-supported by medically acceptable diagnostic techniques. Pl.'s Br. 5–6. This argument misreads the governing regulations, which expressly condition an assignment of controlling weight on the ALJ's "find[ing] that a treating source's opinion . . . *is* well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not* inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (emphasis added); *see Russell v. Colvin*, No. 7:15cv434, 2017 WL 818608, at *4 (W.D. Va. Jan. 31, 2017) (noting that a "treating physician's opinion is not automatically entitled to controlling weight"), *adopted by* Order, ECF No. 24 (W.D. Va. Mar. 1, 2017); SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996) ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.").

post-operative diagnostic images ordered by Dr. Diminick were normal insofar as they showed

the surgical hardware to be in good position and revealed no obvious abnormalities that Dr.

Diminick thought required immediate surgery or similarly aggressive treatment. R. 25–26, 28;

*see, e.g.*, R. 351, 364, 398–99, 402, 405, 413.

ALJ Annos then gave "little weight" to Dr. Diminick's and Dr. Moore's opinions

expressed in the Musculoskeletal Questionnaires because he found that the physicians' opinions

were "not consistent with or supported by" their "own treatment notes," R. 30 (citing R. 278–79,

351–52, 361, 364–66, 367, 370, 373–75, 382, 402–04, 413, 424, 430–36, 441, 443), and that

both doctors "failed to provide any explanation or cites to objective findings" to support their

opinions, *id.* (citing R. 388–90, 391–93). These are legitimate reasons for an ALJ to discount or

reject a treating physician's opinion, 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4), so

long as they are supported by relevant evidence in the record. *See Bishop*, 583 F. App'x at 67;

*Kersey*, 614 F. Supp. 2d at 693 (explaining that an ALJ may assign "little to no weight" to a

treating physician's opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) if

the ALJ "sufficiently explains his rationale and if the record supports his findings").

Candi L. does not directly challenge ALJ Annos's stated reasons for discounting the

extreme functional limitations that Drs. Diminick and Moore identified in their assessments. *See*

*generally* Pl.'s Br. 6–17. Instead, she asks the Court to reject the ALJ's conclusion that the

doctors' opinions were not consistent with or supported by the medical record, including specific

pages from their own treatment notes, by "[l]ooking at th[is] evidence from the other side of the

coin." *Id.* at 13. She then recounts portions of each medical exhibit cited by ALJ Annos and

posits that these exhibits either "support" her doctors' medical opinions or do not contain

"persuasive contradictory evidence" to justify giving them little weight.[9] *See id.* at 7–17. But she

does not identify any specific error in ALJ Annos's contrary conclusion or point to any piece of

evidence not considered by the ALJ that might have changed the weight he assigned to the

opinions. *See Reid*, 769 F.3d at 865. The Court "cannot simply look at the same evidence and

reverse the ALJ on the basis that it could have reached a different result." *Carr v. Berryhill*, No.

6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017). Rather, it "must defer" to the

weights ALJ Annos assigned to Dr. Diminick's and Dr. Moore's opinions "unless they are not

supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th

Cir. 2015). Critically, "[t]he possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's findings from being supported by

substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation marks

omitted); *accord Johnson*, 434 F.3d at 653 ("Where conflicting evidence allows reasonable

minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on

the ALJ." (brackets omitted)).

The record supports ALJ Annos's findings that Drs. Diminick and Moore failed to

explain the extreme functional limitations they identified in their assessments and that those

opinions were not consistent with or supported by their own treatment notes. For example, aside

---

[9] In making this argument, Candi L. relies almost exclusively upon portions of the cited treatment notes
that document her description of her hip pain and physical limitations, including her reports that she used
a cane throughout the relevant period. *See, e.g.*, Pl.'s Br. 7, 8, 11, 12, 14, 15, 16. Contrary to Candi L.'s
suggestion, however, her subjective complaints are not "medically acceptable clinical evidence," *id.* at 15,
that could independently support her doctors' otherwise unexplained opinions about her functional
limitations. *See Craig*, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without
more, 'I observed my patient telling me she was in pain.'"). ALJ Annos also adequately explained why
the record as a whole showed that Candi L.'s chronic pain was not as severe or functionally limiting as
she alleged. *Cf. Weaver v. Colvin*, No. 3:15cv26, 2016 WL 4768841, at *11 (W.D. Va. Sept. 13, 2016)
(noting that an ALJ may reasonably question a treating physician's medical opinion that relies too heavily
on a patient's subjective reports, especially where the ALJ found the same patient's statements describing
his symptoms and functional limitations to be less that fully credible (citing *Morris v. Barnhart*, 78 F.
App'x 820, 824 (3d Cir. 2003))).

from noting that Candi L. suffered chronic hip pain, neither doctor offered a clear explanation

why she could only sit and stand/walk for between five and twenty minutes at one time or why

she needed to use a cane or other assistive device whenever engaged in "occasional

standing/walking," R. 388–90, 391–93. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). ALJ

Annos also cited specific pages from treatment notes produced throughout the relevant time

where Dr. Diminick observed that Candi L. walked with a limp (with no indication that she used

any assistive device after the examination on June 11, 2013) and endorsed some degree of "pain"

with movement of the right hip joint, but otherwise recorded mostly "normal" or "unremarkable"

findings on physical exams and post-operative diagnostic images. R. 30 (citing R. 352, 361, 365,

367, 370, 373, 403). *See Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) (finding no error

in ALJ's weighing of a treating-source medical opinion where the ALJ "did not summarily

conclude that [the] opinion merited little weight" and, although he "did not cite specific pages in

the record" to support his finding that the claimant's limitations were "not supported by [the

physician's] office notes," his explanation nonetheless "relied on and identified a particular

category" of relevant evidence). Dr. Moore's progress notes likewise document generally

unremarkable physical findings except that Candi L. walked with a limp while using a cane and

once exhibited "limited" range of motion in both hips. Finally, both physicians relied on

"appropriate" prescription medications, R. 24, and other conservative treatments to manage

Candi L.'s residual pain, and, as the ALJ correctly pointed out, Candi L. often reported that her

pain was tolerable or adequately controlled on these medications, R. 28. All of this information

provided persuasive contrary evidence to support ALJ Annos's "specific, legitimate reasons" for

why he discounted the physicians' opinions that Candi L.'s chronic hip pain resulted in extreme

functional limitations. *Bishop*, 583 F. App'x at 67.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**DENY** Plaintiff's Motion for Summary Judgment, ECF No. 17, **GRANT** the Commissioner's

Motion for Summary Judgment, ECF No. 19, **AFFIRM** the Commissioner's final decision, and

**DISMISS** this case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: July 31, 2018

Joel C. Hoppe
United States Magistrate Judge